FILED

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

|  |  |  |
|---|---|---|
| VICTOR CHERRY and JAMES JOHNSON, on behalf of themselves and all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 3:10CV819 |
| WELLPOINT, INC., d/b/a ANTHEM HEALTH PLANS OF VIRGINIA, INC. and/or ANTHEM BLUE CROSS AND BLUE SHIELD, | ) ) ) ) | Individual Actions and Representative Action (as to OWBPA claims, only) |
| Defendant. | ) | |

## COMPLAINT

Plaintiffs Victor Cherry ("Cherry") and James Johnson ("Johnson") (collectively, "Representative Plaintiffs") file this Complaint, both individually and in their representative capacities on behalf of themselves and of others similarly situated (collectively, "Plaintiffs"), against WellPoint, Inc., d/b/a Anthem Health Plans of Virginia, Inc. and/or Anthem Blue Cross and Blue Shield ("Defendant" or "WellPoint"), and allege as follows:

## PRELIMINARY STATEMENT

1.      This action is brought as a representative or collective action to remedy Defendant's violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.*, arising out of WellPoint's attempts to secure releases of age discrimination claims without providing adequate notice and without providing information required by law to obtain valid age waivers or releases from the group or class of individuals subject to the same termination scheme or plan.

2.     This action is further brought to remedy individual violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.* and Virginia Human Rights Act, Virginia Code §§ 2.1-714 *et seq.*

3.     Plaintiffs' employer, Anthem Health Plans of Virginia, Inc. (trading as, on information and belief, Anthem Blue Cross and Blue Shield), merged with WellPoint in 2004. In obtaining approval for the merger from the Commonwealth of Virginia, WellPoint represented that it would not institute personnel reductions once it merged its operations with the operations of Plaintiffs' employer, the previously-merged Blue Cross and Blue Shield/Trigon/Anthem. However, WellPoint had already planned, and subsequently implemented, a series of forced separations and discharges that favored younger employees and disparately treated and/or impacted Representative Plaintiffs and other similarly situated WellPoint employees age 40 years and older. As part of the plan to reduce the numbers of older workers, Defendant targeted not only older employees generally, but employed age-related stereotyping which considered negatively those older employees such as Representative Plaintiffs Cherry and Johnson who were, additionally, perceived as disabled (and discriminated against) because they (1) had histories of medical conditions or (2) had exercised rights to leave benefits for medical care or care of family members.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343 and 29 U.S.C. § 626(c).

5.     Venue is proper in this District under 28 U.S.C. § 1391(b), as the actions and unlawful employment practices alleged herein were committed in the Eastern District of Virginia and

as Defendant operates administrative offices and conducts other business operations in Richmond, Virginia.

6.      Representative Plaintiffs Cherry and Johnson have exhausted all required administrative procedures and timely filed formal complaints with the Equal Employment Opportunity Commission. The EEOC has issued a "Notice of Right to Sue" for each Representative Plaintiff and this suit has been brought within 90 days of each such Plaintiff's receipt of such Notice consistent with the procedures for bringing this representative action pursuant to the ADEA/OWBPA.

## PARTIES

7.      Representative Plaintiff Cherry is a citizen of the United States and resides in Richmond, Virginia. Cherry was employed by WellPoint and its predecessor companies for over eight (8) years when, on September 6, 2006, WellPoint terminated his employment. Cherry was 48 years old at the time his employment was terminated.

8.      Representative Plaintiff Johnson is a citizen of the United States and resides in Richmond, Virginia. Johnson was employed by WellPoint and its predecessor companies for over nineteen (19) years when, on September 6, 2006, WellPoint terminated his employment. Johnson was 49 years old at the time his employment was terminated.

9.      Defendant WellPoint is an Indiana corporation doing business in Virginia. Although its headquarters are located in Indiana, it maintains corporate offices in Richmond, Virginia for its Virginia operations. WellPoint is a managed healthcare and insurance company. It is the parent company of some fourteen (14) Blue Cross and Blue Shield ("BCBS") or former BCBS entities, including the successors to BCBS of Virginia. When BCBS of Virginia subsequently converted to a

3

publicly-traded corporation, it became Trigon Healthcare, Inc. ("Trigon"). Trigon was acquired by

Anthem, Health Plans of Virginia, Inc. ("Anthem"), in or about 2002. Anthem acquired WellPoint

Health Networks, Inc., in November 2004 and subsequently changed its combined name to

WellPoint, Inc. In 2006, WellPoint employed more than 40,000 employees.

     10.    Plaintiffs Cherry and Johnson consent to become party plaintiffs in this representative

ADEA action pursuant to 29 U.S.C § 626(b), incorporating 29 U.S.C. § 216, and have filed separate

consents to "opt-in" to this matter.

## PLAINTIFFS' REPRESENTATIVE ALLEGATIONS FOR
## 29 U.S.C. § 626(B) COLLECTIVE ACTION

     11.    Representative Plaintiffs bring this action on behalf of themselves, and all others

similarly situated, pursuant to 29 U.S.C. § 626(b) (which incorporates 29 U.S.C. § 216) as

representative members of a proposed Plaintiff waiver collective for violations of the ADEA and

OWBPA amendments related to age discrimination waivers sought by Defendant as stated in the

allegations contained in Count Three hereinbelow. Plaintiffs propose one "Waiver Collective"

which sets out a distinct group within the "Termination Collective" presently pending in the matter

of *Merritt, et al v. WellPoint, Inc.*, Civil Action No. 3:08cv272.

     12.    Representative Plaintiffs Cherry and Johnson are similarly situated to persons

constituting the representative "Waiver Collective," defined as follows:

> The "Waiver Collective" is composed of all persons age 40 or older
> who were employed in WellPoint's Virginia operations, were
> discharged during the period from January 2005 through the present,
> and were offered "Severance Pay" conditioned upon signing a
> General Release and Waiver Agreement, including a release and
> waiver of age discrimination claims that (1) did not include 45 days to
> consider the release or waiver; (2) did not accurately describe the
> affected decisional unit(s) within the termination scheme or plan;
> and/or (3) did not include the ages and job titles of all persons

4

terminated by WellPoint and retained by within the appropriate decisional unit(s) as part of the termination program. All members of "Waiver Collective" executed the General Release and Waiver Agreement. Cherry and Johnson are representative of this Waiver Sub-Collective.

13. Representative Plaintiffs Cherry and Johnson are similarly situated to the group of persons they seek to represent by this action for the purposes of 29 U.S.C. § 216(b) in that they challenge the unlawful attempt (which was largely successful) by WellPoint to improperly obtain invalid age discrimination releases or waivers from employees as part of and in conjunction with the systemic termination of a significant portion of WellPoint's workforce (as it existed on/in 2005 or thereafter).

14. Representative Plaintiffs furthers challenge WellPoint's attempts to, through the use of invalid age discrimination releases or waivers, chill the timely filing of age discrimination claims in violation of federal law mandates. Representative Plaintiffs and the similarly situated members of the putative Collective are the victims of the same plan, practice or policy and systematic actions by and through which WellPoint improperly obtained waivers of age discrimination claims without following the mandates of the Older Worker Benefits Protection Act, 29 U.S.C. § 626(f).

15. As of January 2005, WellPoint employed more than 40,000 employees. Upon information and belief, several hundred WellPoint Virginia employees age 40 and older were discharged as a result of a systematic campaign to reduce WellPoint's national workforce as it existed on January 1, 2005, and to replace it with younger employees. Although the exact number and identities of Collective members are unknown to Representative Plaintiffs at this time, and can only be ascertained through appropriate discovery, Representative Plaintiffs are informed, and on the

basis of that information believe, that the Collective consists of several hundred persons. Collective members may be readily identified through records maintained by WellPoint.

16. Pursuant to their identification, members of the "Waiver Collective" may be notified of the pendency of this action by published notice to the Collective and their opportunity to file opt-in consent forms, if deemed necessary by this Court, by individual First Class mailed notice.

17. Representative Plaintiffs request approval of notice, upon discovery from WellPoint, of the putative members of the Collective, and mailing at Plaintiffs' expense of notice and opt-in forms to putative members of the Collective.

18. Representative Plaintiffs and all members of the "Waiver Collective" have been denied the statutory opportunity to determine whether they wished to make a knowing and voluntary waiver of their rights under the ADEA, as enforceable by the OWBPA. Plaintiffs are entitled to separate declaratory and injunctive relief for Defendant's OWBPA violations and the opportunity to vindicate their ADEA rights.

19. A collective or representative action is superior to other available methods for the fair and efficient adjudication of the litigation regarding the conduct of Defendant in connection with obtaining invalid waivers of the age discrimination claims that were available to WellPoint employees following a series of reductions in force, conducted from 2005 to date and continuing, since individual joinder of all members of the Collective is impracticable. Although the damage suffered by some individual members of the Collective as a result of the loss or waiver of their ADEA rights may be hundreds of thousands of dollars, other Collective members may be damaged in lesser amounts; damages of either magnitude are nonetheless relatively small compared to the expense and burden of individual prosecution of this litigation and would be unduly duplicative.

6

Even if any group of Collective members themselves could afford such individual litigation, the court system could not. Individualized litigation presents the potential for inconsistent or contradictory judgments, and magnifies the delay and expense, to all parties and to the court system, of resolving this controversy. By contrast, the collective action device presents far fewer management difficulties and provides the benefits of unitary, consistent adjudication, economies of scale, and comprehensive supervision by a single court.

## FACTS

### PLAINTIFFS ARE LONG-TERM EMPLOYEES WITH EXCELLENT PERFORMANCE HISTORIES

20.     Each of the named Representative Plaintiffs were long-term employees of WellPoint and its predecessor companies with accomplished histories of achievement.

21.     Each Representative Plaintiff began employment with BCBS and continued employment after BCBS became "Trigon Healthcare, Inc."

22.     At the time WellPoint selected each Representative Plaintiff for termination, Cherry, had been employed for eight (8) years and Johnson had been employed for nineteen (19) years.

### ANTHEM ACQUIRES PLAINTIFFS' LONG-TERM EMPLOYER UNDER SCC-IMPOSED CONDITIONS

23.     In May 2002, Trigon entered into an agreement to merge with Anthem. In order to obtain approval of the proposed merger, Trigon filed a petition with the Virginia State Corporation Commission (the "SCC") and its Bureau of Insurance seeking approval of the merger.

24.     The SCC Final Order authorizing the Trigon-Anthem merger imposed, among other things, the condition that twelve Anthem services and operations, including claims processing and case management, customer service, actuarial, underwriting, marketing, quality management,

community relations, distribution management, sales, provider services, medical management and network development, would continue to be performed in Virginia until such time as a waiver was granted. IT support for these services and components was and is necessary to their continued functions.

25.     This condition was imposed to assure that such insurance operations would not leave Virginia, that the insurer would remain directly accountable to Virginia regulatory agencies, and that the services and operations directly affecting policyholders, insureds and the public would continue to be performed from offices within the Commonwealth of Virginia.

26.     When Anthem further expanded and changed its name to WellPoint, it was necessary for the new entity operating as WellPoint to continue to abide by the commitments made to the Virginia SCC regarding its continued Virginia operations.

27.     On information and belief, WellPoint provided additional assurances that it would not only honor the SCC's conditions on maintaining services in Virginia, but that it would undertake no personnel reductions in force or consolidations.

### WELLPOINT'S PLAN TO TERMINATE OLDER WORKERS

28.     On information and belief, despite its representations, WellPoint set out to reduce personnel in violation of the commitment its senior executives had made to the Virginia SCC.

29.     WellPoint is organized into "Corporate," "Shared Services" and "Local" organizational structures. "Local" operations include the provision of regional and state management of insurance claims and underwriting services. On information and belief, the "Corporate" organization includes centralized management and personnel operations for all such "Local" operations. WellPoint has designated its Human Resources Department as a "Shared Service"

8

which is managed by a single corporate executive in conjunction with state or local affiliates. Under this organization, WellPoint personnel decisions are centrally managed and supervised.

30.    On information and belief, the personnel actions complained of herein were part of a centrally managed plan which was designed, implemented and supervised by WellPoint home office executives.

31.    WellPoint wished to eliminate, consolidate and/or relocate Virginia positions in several of the twelve major groups of services and operations which were the subject of the SCC's Orders without the approval of the Virginia SCC. Representative Plaintiffs worked in these Virginia services and operations.

32.    On further information and belief, WellPoint had previously made, and violated, such agreements with other states, including New York. These states, too, had been wary that if WellPoint's proposed mergers were approved in their states, the result would be the consolidation and loss of jobs in what was a competitive insurance industry. Two months after WellPoint acquired Empire Blue Cross Blue Shield in late 2005, it announced that the purchase "will result in no layoffs in New York state." On information and belief, notwithstanding this statement regarding WellPoint's New York operations, WellPoint engaged in layoffs in New York.

33.    On information and belief, in late 2005 and early 2006, following the Virginia merger of Anthem/Blue Cross and Blue Shield with WellPoint, and contrary to the representations made by WellPoint in order to obtain permission to do business in the Commonwealth of Virginia, WellPoint began a series of actions designed to significantly reduce personnel in its Virginia operations.

34.    On information and belief, senior WellPoint executives undertook a plan in or about 2005 to reduce personnel throughout the country, including the personnel in its Virginia operations,

and established specified percentage reductions for each of the years 2006, 2007 and 2008, which reductions were extended through at least 2010. On further information and belief, consistent with WellPoint's organizational structure described hereinabove, these reductions were centrally planned and were designed to be spread across regions and departments in Virginia so that they would appear to be isolated and widespread, when in fact they were crafted as an organized plan and designed to accomplish stated percentage corporate reductions.

35.     On information and belief, while WellPoint planned larger reductions-in-force later in its initial three-year plan, WellPoint executives knew that in order to justify large and visible reductions-in-force, it would have to first seek permission from the Virginia SCC for Virginia reductions. Because of the formal (and, on information and belief, informal) commitments made to the SCC, any consolidations and transfers of the specified Virginia operations and services would be contrary to the standing SCC Order. Thus, on further information and belief, WellPoint planned to accomplish less visible reductions through the immediate elimination of certain segments of workers from the WellPoint workforce.

36.     On information and belief, WellPoint collected and input data and its employees for the purpose of utilizing analytical models to determine which employees it would retain and which employees it would terminate. On further information and belief, when WellPoint surveyed its workforce to determine which employees' positions it would terminate, it supported its internal decision-making processes with impermissible, age-biased stereotypes, including the stereotype that older employees, including older employees with histories of medical conditions or disabilities, were less productive or more costly employees.

10

37. This reduction-in-force process was intended to affect and/or had the effect of adversely affecting a disproportionate percentage of older employees (age 40 and older), including older employees with histories of medical treatment or leave for family medical care, and/or who WellPoint perceived as disabled.

## WELLPOINT'S ATTEMPT TO OBTAIN SCC APPROVAL FOR ITS UNDISCLOSED VIRGINIA OPERATIONAL CHANGES

38. Following this series of surreptitious personnel reductions and in anticipation of larger planned reductions that could not be as easily concealed, in 2007 WellPoint publicly outlined its plans to consolidate and move services and operations from Virginia.

39. On April 20, 2007, WellPoint filed a Petition to Amend the Trigon-Anthem Merger Restrictions originally set forth in the SCC's May 2002 Final Order. In its Petition, WellPoint sought to alter the commitment that Anthem/WellPoint had previously made in order to obtain the SCC's approval for merger; in particular, it sought SCC permission to make more extensive personnel reductions in the services and operations restricted by the prior Order (including, but not limited to, IT services for such operations). In so doing, WellPoint also implicitly sought relief from the representations and commitments it made to the SCC at the time of the proposed Anthem merger to continue to honor the existing restrictions on personnel reductions if the SCC approved the merger (under which restrictions WellPoint continues to operate).

40. After a SCC hearing on the Petition, WellPoint President and CEO Angela Braly stated that one operation the company planned to consolidate was information technology (IT).

41. However, on information and belief, at the time of the SCC application to make the reductions, the planned percentage reductions were already in motion. WellPoint's course of

11

discriminatory actions complained of herein predate CEO Braly's 2007 SCC testimony and WellPoint's 2007 failed attempt to obtain SCC permission for restructuring including Virginia workforce reductions in these core areas.  Long before WellPoint sought the SCC's permission to make such operational changes to WellPoint's IT department in which Representative Plaintiffs were employed, it had already implemented significant, though surreptitious, personnel reductions in 2005 and 2006. In fact, the employment of Cherry, Johnson, and other Virginia IT employees, as well as employees in other Virginia operations, had already been terminated as part of the ongoing percentage reductions at WellPoint.

42.     On August 9, 2007, the SCC entered a Final Order rejecting large parts of WellPoint's Petition.  Notably, the SCC required that WellPoint continue to provide claims processing, case management, medical management, customer service, provider services and network development services from its offices located in Virginia.

### WELLPOINT TARGETS CATEGORIES OF OLDER EMPLOYEES AS PART OF THE PLANNED REDUCTION

43.     Like most employers, WellPoint policies include provisions for certain leave benefits for employees to use for illnesses and for caring for sick family members.

44.     At no time relevant hereto did WellPoint advise employees that their use of these benefits would reflect negatively on their performance record, jeopardize their employment or subject them to termination.

45.     However, when WellPoint determined which employees it would select for termination, Plaintiffs assert that WellPoint implemented a selection process which considered age, and age-related characteristics, as negative factors and/or implemented evaluation and selection

processes which resulted in the termination of large numbers of older workers. Older workers, many of whom had experienced conditions necessitating medical care or had exercised their rights to avail themselves of leave benefits provided by the company, were selected for termination.

46.     WellPoint did not announce departmental or system-wide personnel reductions. Instead, in an effort to disguise the nature of the personnel reductions and the characteristics of the persons targeted for discharge, WellPoint's plan called for the quiet termination of older workers in a number of departments across the company.

47.     Uniformly, these terminations were in the very services and operations that were subject to the SCC orders: claims processing and case management, customer service, actuarial, underwriting, marketing, quality management, community relations, distribution management, sales, provider services, medical management and network development.

48.     WellPoint characterized the terminations as "position eliminations," "resignations," and isolated "personnel actions"; however, on information and belief, the terminations were designed, orchestrated, monitored and tallied to achieve specific numeric and/or percentage goals. Moreover, these terminations were designed to quietly effect movement of operations in areas over which the SCC retained control without SCC approval.

49.     These personnel reductions were the result of an "exit incentive or other termination plan affecting a group or class of individuals" subject to the OWBPA's procedural requirements that the ages and job categories of all persons who were affected, and not affected, by the reduction plan be provided in order for WellPoint to obtain valid and enforceable releases and waivers of age discrimination claims.

13

50.     Representative Plaintiffs Cherry, and Johnson were among a large group of older employees who were (and, with respect to other employees, continue to be) subjected to a subjective and discriminatory process designed to reduce older workers from WellPoint's employment rolls and/or having the impact of terminating such older workers' employment.

### VIRGINIA IT DEPARTMENT REDUCTIONS

51.     In Representative Plaintiffs' department (the Virginia IT Department) alone, approximately 40 employees were laid off in a reduction-in-force which spanned the years 2005 and 2006 and targeted older employees.

52.     In accordance with its planned reductions, younger employees were retained and older workers were terminated. WellPoint employed workers of all ages in its IT department. Indeed, the younger employees had the least seniority and would be expected to be the first employees released in an age-neutral reduction-in-force. However, on information and belief, WellPoint spared its younger employees in the reduction.

53.     None of the Virginia IT employees terminated in 2005 were in their 20s. Only six (6) of the Virginia IT employees terminated in 2005 were in their 30s. However, thirteen (13) of the Virginia IT employees terminated were in their 40s; six (6) of the IT employees terminated in 2005 were in their 50s; and six (6) of the IT employees terminated in 2005 were in their 60s. Twenty-five (25) of the Virginia IT employees terminated in 2005 were age 40 and older, compared to only six (6) employees under age 40.

54.     On information and belief, WellPoint failed to provide notices, or to provide valid notices, to employees terminated as part of the 2005 terminations, either nationally or in Virginia, in conformity with and as required by the OWBPA.

14

55.     In continuation of its systemic plan to reduce the number of older members of its workforce, WellPoint terminated the employment of more workers in 2006, both at the national level and in Virginia.  On information and belief, WellPoint continued to use age as a negative factor in its 2006 terminations and, no employees in their 20s were terminated in either 2005 or 2006 as part of the Virginia IT reductions..  As part of WellPoint's systemic plan to reduce the older members of its workforce, older workers were targeted for termination and/or were adversely impacted by the subjective selection processes WellPoint utilized to determine who, among its workforce, would be terminated in 2006.

56.     On information and belief, WellPoint failed to provide notices, or to provide valid notices, or valid notices, to employees terminated as part of the 2006 terminations, either nationally or in Virginia, in conformity with and as required by the OWBPA.

57.     The Virginia IT terminations were not random or isolated terminations.  Rather, they were a part of a unified, centrally planned and coordinated reduction effort.  Twenty-six (26) out of the thirty-one (31) 2005 Virginia IT terminations occurred in an early May 2005 cluster.

58.     WellPoint's 2006 Virginia IT terminations occurred throughout 2006 but, on information and belief, WellPoint attempted to conceal the true nature of the reduction-in-force and the makeup of its "decisional units" by staggering or staging the reductions to disguise the pattern of impact on older workers.

59.     On information and belief, WellPoint failed to provide required notices, or to provide valid notices, to employees terminated as part of the terminations occurring after 2006, either nationally or in Virginia, as required by the OWBPA.

60.     On information and belief, many of the affected older employees had also experienced histories of medical leaves, medical treatment, and/or had family members with medical and caregiving needs.

### REPRESENTATIVE PLAINTIFF VICTOR CHERRY

61.     Representative Plaintiff Victor Cherry was employed by WellPoint and its predecessor companies for eight (8) years until his employment was terminated on September 6, 2006. At the time of his termination Cherry was a Senior Programmer in WellPoint's Virginia IT Department.

62.     Throughout his employment with WellPoint and its predecessors, Cherry received favorable reviews and positive evaluations, and consistently met or exceeded his employer's legitimate expectations.

63.     During his employment with WellPoint Cherry twice took FMLA leave; once when his daughter was born in 1998, and later to care for his wife when she became ill.

64.     On August 6, 2006, Cherry was informed that his employment would be terminated effective September 6, 2006.

65.     On information and belief, no less than an additional forty-seven (47) employees in the Virginia IT Department were terminated by WellPoint on August 6, 2006. On information and belief, all of the employees laid off by WellPoint that day were over the age of forty-five (45), except for a single employee who was thirty-two (32) years of age.

66.     WellPoint informed Cherry that, in order to receive any severance pay, he would have to sign a Waiver Agreement/General Release.

67.     Based on the information and representations WellPoint provided to him at the time, Cherry signed the Release.

68.     In late September 2009, Cherry received a letter from WellPoint advising him that the EEOC District Office in Chicago had found reasonable cause to believe that the Release that he signed upon his separation from WellPoint in 2006 unlawfully waived his right to file a charge of discrimination with the Commission.

69.     The letter further advised that, accordingly, Cherry would have 300 days from the date he received the letter to file an EEOC charge based on any discrimination Cherry experienced at WellPoint during the 300 days prior to the date on which he signed the release.

70.     On information and belief, the letter Cherry received followed the EEOC's investigation into the waivers of age discrimination claims obtained by WellPoint as part of the nationwide reductions alleged hereinabove.

71.     On or about July 12, 2010 Cherry filed a timely charge of unlawful discrimination based on age with the EEOC.

### REPRESENTATIVE PLAINTIFF JAMES JOHNSON

72.     Representative Plaintiff James Johnson was employed by WellPoint and its predecessor companies for nineteen (19) years until his employment was terminated on September 6, 2006. At the time of his termination, Johnson was an Application Systems Manager in WellPoint's Virginia IT Department.

73.     Throughout his employment with WellPoint and its predecessors, Johnson received favorable reviews and positive evaluations, and consistently met or exceeded his employer's legitimate expectations.

17

74.     As a manager at WellPoint, Johnson was personally aware of the process WellPoint managers were instructed by WellPoint to utilize which used subjective factors to "rank" employees. WellPoint managers were instructed to consider employees' years of service, which correlates with age, as well as subjective factors such as their assessment of skills and the departmental "need" for such employees. On information and belief, senior WellPoint management instructed its lower level management to also consider the amount of leave taken by employees and employees' salaries, both of which factors correlate with an employee's age, in determining which employees would be let go.

75.     On information and belief, corporate headquarters and senior WellPoint management dictated cost reduction targets for lower level managers to obtain. Local WellPoint managers had little discretion or ability to reduce costs, except through personnel or labor costs.

76.     Local WellPoint managers achieved the directed cost reduction targets by effecting personnel reductions in their local departments, using age-related characteristics and subjective factors to select which employees would be terminated. An employee's salary (frequently dictated by time-in-position or years of experience in the field) was a factor in deciding which employees would be terminated. On information and belief, WellPoint identified the older employees selected in this manner for termination as "ineligible for rehire."

77.     But for WellPoint's intentional age discrimination as part of the systemic reductions from 2005 to date, employees released in a reduction-in-force would not be designated as "ineligible for rehire." In a typical reduction-in-force Johnson, as a manager, would simply be told to reduce costs by a certain amount – not to preclude the future rehire of older former employees.

78.     In 2004, Johnson tore his Achilles tendon and was forced to take three (3) weeks of protected medical leave under the FMLA in order to recover.

18

79.     On August 6, 2006, Johnson was informed that his employment would be terminated effective September 6, 2006.

80.     An additional forty-seven (47) employees in the Virginia IT Department were terminated by WellPoint on August 6, 2006. On information and belief, all of the employees laid off by WellPoint that day were over the age of forty-five (45), except for a single employee who was thirty-two (32) years of age.

81.     WellPoint informed Johnson that, in order to receive any severance pay, he would have to sign a Waiver Agreement/General Release.

82.     Based on the information and representations WellPoint provided to him at the time, Johnson signed the Release.

83.     In late September 2009, Johnson received a letter from WellPoint advising him that the EEOC District Office in Chicago had found reasonable cause to believe that the Release that he signed upon his separation from WellPoint in 2006 unlawfully waived his right to file a charge of discrimination with the Commission. The letter further advised that, accordingly, Johnson would have 300 days from the date he received the letter to file an EEOC charge based on any discrimination Johnson experienced at WellPoint during the 300 days prior to the date on which he signed the release.

84.     On information and belief, the letter Johnson received followed the EEOC's investigation into the waivers of age discrimination claims obtained by Defendant as part of the nationwide reductions alleged hereinabove.

85.     On or about July 13, 2010, Johnson filed a timely charge of unlawful discrimination based on age with the EEOC.

## WELLPOINT'S ASSERTED "JOB ELIMINATION" IS PRETEXT FOR AGE DISCRIMINATION

86.     WellPoint's stated reason for Cherry's and Johnson's job "elimination" is pretextual. Their job functions were not eliminated, but continued on after their terminations. The actual reason for their discharges was age-based discrimination, compounded by impermissible consideration of age-based stereotypes of older workers as more costly, in part because they are perceived as more likely to avail themselves of medical leave benefits.

87.     There was no merit-based reason for termination. Indeed, none was ever mentioned, because Cherry and Johnson had performed consistently at or above their employer's legitimate and objective expectations during his WellPoint employment.

88.     Nor was there any authority for reductions in Virginia IT operations. In accordance with the standing SCC Order, WellPoint was not authorized to effect "synergy savings" in IT as it affected the core services in Virginia covered by the SCC Order.

89.     Moreover, WellPoint had no financial basis upon which to terminate Cherry and Johnson.  In early 2006, only a few months before Cherry's and Johnson's positions were "eliminated," WellPoint announced a 4th quarter 2005 profit in excess of $652 million.  The contributions made by Cherry and Johnson in IT had supported and enabled this level of corporate performance.

## THE AGE DISCRIMINATORY INTENT AND IMPACT OF WELLPOINT'S TERMINATION/FORCE REDUCTION PLAN

90.     On information and belief, age is and has been considered a negative factor in determining which employees to retain and which to release as part of WellPoint's termination/force reduction plan.

91.     WellPoint has engaged in a reduction-in-force in each of the Representative Plaintiffs' departments (and across the company) in which employees similarly situated to Representative Plaintiffs have been terminated on the basis of their ages and/or age-related characteristics.

92.     On information and belief, WellPoint has instructed its management to reduce the workforce through the use of "metrics" which have disproportionately evaluated and/or impacted older employees as a collective group compared to younger, similarly-performing and -qualified employees. On further information and belief, these "metrics" have been used to achieve specific percentage targets, by year, which were centrally designed, managed and measured to assure the reductions of older workers in local region offices within Virginia.

93.     Beginning in the 2005 timeframe, WellPoint implemented a system of human resource analytics in what it characterized as "human capital" and/or "talent" management. On information and belief, these newly devised business models or "metrics" included measures of employee "value" which considered age a negative factor and/or the use of which adversely impacted older workers. Moreover, on further information and belief, these "metrics" assigned "costs" to Representative Plaintiffs and other older workers which negatively considered age, or age-related characteristics, as negative factors and/or the use of which adversely impacted older workers as a class.

94.     During this time, WellPoint developed an "HR Metrics and Analytics Group" to collect data on its employees. On information and belief, one purpose of this Group was to advise the Human Resources (HR) Department and senior WellPoint management in decisions regarding who to terminate and who to retain as employees in order to obtain the desired percentage reductions.

95.    In order to achieve the reductions WellPoint senior management established in the desired targeted percentages under its centralized plan, WellPoint has negatively and selectively treated, evaluated, demoted, reassigned and harassed its older employees (including through, on information and belief, the sudden issuance of less satisfactory performance evaluations than these employees have earned for years).

96.    During the time WellPoint has been systematically reducing its older staff, it has tried to conceal the nature of the force reduction by labeling the involuntary terminations "synergy savings," "job eliminations," "retirements," "resignations" and "performance-" or "disciplinary-" based terminations.   Irrespective of these labels, on information and belief, WellPoint has counted these discrimination-based terminations as part of its sought-after percentages for national, regional and local targets.

97.    WellPoint has attempted to hide the fact that it was implementing a layoff or termination of a group or class of employees and was disproportionately reducing older employees in its work force in higher percentages than younger employees.  It has attempted to label involuntary terminations as employee-initiated.  WellPoint has also sought the release of age discrimination claims without providing terminated employees information required by federal law so that they may fully consider such releases.

98.    Defendant's business needs did not necessitate a reduction of the workforce.  No business need necessitated the implementation of policies designed to, or having the impact of, adversely affect older workers.  WellPoint was experiencing record-setting growth and revenue increases at the time the planned terminations were initiated.  It retained younger similarly situated employees outside the protected age class while it terminated Representative Plaintiffs and similarly

situated older individuals. In many instances, the duties performed by Plaintiffs and other similarly situated individuals were assumed by persons outside the protected age class.

99.     As a result of the Defendant's wrongful acts and omissions set out above, Plaintiffs have been damaged, including, but not limited to, damages due to having suffered loss of employment, loss of salary and salary increases, and loss of health insurance and other employment-related benefits.

100.    Other similarly situated employees, as a class, have been intentionally discriminated against and/or adversely impacted by WellPoint's actions described above. Upon information and belief, from January 2005 through the present, persons similarly situated to Representative Plaintiffs have been terminated as part of this scheme or plan and suffered similar damages.

101.    Moreover, WellPoint has been, and continues to be, engaged in a coordinated effort to reduce the numbers of its older employees, including those older workers who have availed themselves of medical treatment or leave or WellPoint has perceived as disabled.

## WELLPOINT FURTHERS ITS PLAN BY ILLEGALLY CHILLING AND OBTAINING RELEASES OF AGE CLAIMS

102.    In order to conceal the pattern and practice of age discrimination terminations, as set forth above, WellPoint sought to obtain releases of age discrimination claims by improper means. WellPoint offered additional compensation to terminated employees who signed a General Release and Waiver Agreement (a "Release") which included releases of age discrimination and other claims. Such Releases unlawfully failed to provide age and job title information regarding terminated employees and further failed to provide the 45-day period to consider the releases, as required by the

ADEA and OWBPA in order to obtain knowing and voluntary releases and waivers of age discrimination claims from Representative Plaintiffs and others similarly situated.

103.    WellPoint's actions were designed to conceal its pattern and practice of age discrimination and/or the adverse age effects of WellPoint's evaluation and termination selection processes and to chill, through the provision of unenforceable waiver agreements, the protected activity of its employees to challenge in timely filings the terminations as age discriminatory. Terminated employees in the protected age class were placed in a position of having to choose between their exercise of protected conduct and receiving compensation at termination that was contingent upon signing the illegal Releases.

104.    Such actions constitute further evidence of WellPoint's improper age animus and willful violation of said laws.

105.    Many former employees age 40 and older who have signed such unlawfully obtained age waivers or releases were provided misleading, incomplete and inaccurate information by WellPoint as part of WellPoint's scheme or plan to deter any legal challenge to its illegal actions and/or the age discriminatory impact of its evaluation and termination selection processes. Employees who hold valid legal claims that WellPoint violated their federally protected rights have been misled and thus unlawfully hindered in their exercise of legal rights, resulting in the delay or omission of the filing of valid claims of age discrimination.

## COUNT ONE
## ADEA - 29 U.S.C. § 626
### Disparate Treatment

106.    Cherry and Johnson, individually, reallege as if fully set forth hereunder all allegations contained in Paragraphs 1 through 105, and further allege:

24

107.    Defendant is an "employer" subject to the requirements of the ADEA and OWBPA. At all times relevant hereto, Cherry and Johnson each met the elements for protection of the ADEA and OWBPA as "employees" pursuant to each.

108.    Defendant has violated the Age Discrimination in Employment Act and/or Older Worker Benefit Protection Act amendments, in that it: (a) utilized discriminatory evaluation and selection procedures for who to retain and not retain which treated disparately employees age 40 and older when compared to similarly qualified and performing younger workers; (b) knowingly sought waivers of federally protected rights and claims in connection with an exit incentive or employment termination program, but failed to provide impacted employees at least 45 days to consider the severance and release proposal, to provide impacted employees adequate notice of their rights, or to provide an accurate description of the decisional unit(s) within the termination scheme or plan and/or to provide the age distribution and job titles of employees selected for termination and of those not selected for termination within such decisional unit(s), as required by 29 U.S.C. 626(f); and (c) mischaracterized forced, involuntary terminations of employment as "job eliminations," "retirements" or "voluntary resignations" when, in fact, it was part of a coordinated and closely monitored plan or program to reduce older workers from its workforce.

109.    Because Defendant engaged and is continuing to engage in a plan or scheme to evade the purposes of the Age Discrimination in Employment Act, and/or because Defendant's explanation of its business justification lacks factual basis and is merely a pretext or subterfuge to evade the purposes of the Act, it violated the ADEA with knowing, willful, intentional, deliberate and reckless disregard of the Act's proscriptions.

25

110.    Defendant's scheme or plan to evade the purposes of the ADEA violated the Act in that:

a.    age was a motivating factor and/or made a difference in the decision(s) to terminate, discharge or constructively discharge older workers, including Cherry and Johnson;

b.    the scheme or plan treated Cherry and Johnson disparately through their separation from employment by termination, without offer of other employment for job positions for which they were qualified;

c.    the scheme or plan retained younger employees who continued to perform work performed by Cherry and Johnson, and/or replaced older workers, including Cherry and Johnson, with younger, less qualified persons;

d.    the scheme or plan excluded older workers, including Cherry and Johnson, from consideration for employment positions when equally effective means to achieve any legitimate employment goals were available with lesser disparate impact on older workers, including Cherry and Johnson; and

e.    the scheme or plan included Defendant's attempt to secure age discrimination waivers and releases through illegal means, including the failure to provide sufficient time to consider the waiver or release and the failure to provide information regarding job titles and ages of employees selected and not selected for termination.

111.    As a result of Defendant's violation of the ADEA, Cherry and Johnson have been deprived of salary, salary increases, bonus programs and employment-related benefits including

health insurance, retirement and severance benefits, and have suffered additional such damages (including incidental damages) to be proved at trial.

## COUNT TWO
### ADEA - 29 U.S.C. § 626
### Disparate Impact

112.   Cherry and Johnson, individually, reallege as if fully set forth hereunder all allegations contained in Paragraphs 1 through 111, and further allege:

113.   On information and belief, Defendant implemented subjective performance and evaluation criteria as a precursor to planned terminations of set percentages of employees, which action had a disparate impact on Defendant's employees age 40 and older, thereby violating the ADEA. Facially-neutral policies which limited the availability of internal transfer options or post-RIF job retention to "satisfactory" levels of performance evaluations had a disparate impact against the older workers against whom the policies were applied. Further, in the course of Defendant's targeted personnel reductions, Defendant utilized a facially age-neutral "cost" analysis of reductions in its workforce, under the heading of "synergy savings" or related terminology, which adversely impacted older workers compared to younger employees who were considered less "costly" to maintain.

114.   On information and belief, Defendant implemented business "metrics" or "analytics" to determine factors upon which employees would be selected for retention (and, conversely, for termination). The application of these business "metrics" or "analytics" had the effect of causing older workers to be chosen for termination and/or adversely affected older workers, including Cherry and Johnson.

115.    As a result of Defendant's violation of the ADEA, Cherry and Johnson have been deprived of salary, salary increases, bonus programs and employment-related benefits including health insurance, retirement and severance benefits, and have suffered additional such damages (including incidental damages) to be proved at trial.

## COUNT THREE
### OWBPA – Sections 626(f)(1)(F)(ii) and/or (f)(1)(H)

116.    Individual and Representative Plaintiffs Cherry and Johnson, on behalf of themselves and all members of the putative Waiver Collectives, reallege as if fully set forth hereunder all allegations contained in Paragraphs 1 through 115, and further allege:

117.    Defendant offered Representative Plaintiffs, and other separated employees, separation pay and other benefits in a proposed severance agreement, but conditioned receipt of such severance on their executing a waiver and release of age discrimination claims.

118.    At the time of termination, Defendant failed to provide Representative Plaintiffs or other separated employees with statutorily required notice to obtain a knowing and voluntary waiver of ADEA claims.

119.    Defendant had implemented an "exit incentive or other termination plan affecting a group or class of individuals" and therefore was required to provide Plaintiffs, and all similarly situated employees, no less than forty-five (45) days to consider the release and waiver and the ages and job titles of all persons affected by the program (both those terminated under the program and those retained by WellPoint).

120.    WellPoint violated the OWBPA when it did not provide the written information required under 29 U.S.C. § 626(f)(1)(H), and/or when it did not provide the 45 days time to consider

the release required under 29 U.S.C. § 626(f)(1)(ii), to employees who were to be terminated pursuant to the phased termination plan WellPoint began implementing in 2005.

121.    As a result of Defendant's actions, terminated WellPoint employees who may hold valid legal claims against WellPoint have been unlawfully deprived of access to the legal process, and have been misled or delayed with respect to their legal rights to file charges of discrimination against WellPoint with the EEOC, or to otherwise pursue claims of unlawful age discrimination against WellPoint.

122.    Because of Defendant's unlawful actions, notice should be provided to all such persons who signed waivers or releases of WellPoint's improper actions (1) that the waivers or releases of ADEA claims are legally void, and (2) of their rights to assert age discrimination claims against WellPoint. Additionally, the time for such individuals to file such claims should be tolled by (1) Plaintiff's filing of a class charge of discrimination at EEOC which placed WellPoint on notice of the class or collective action preserved by such charge, and (2) WellPoint's wrongful actions in failing to properly notify terminated employees of the ages and job categories of those employees selected for termination and not selected for termination as part of the termination and severance program.

123.    As a result of Defendant's actions, Defendant should be estopped or barred from asserting any defense of time limitations to any ADEA claim by Representative Plaintiffs or any person similarly situated to Representative Plaintiffs, whether or not they signed the unlawful and invalid severance agreements.

WHEREFORE, Representative Plaintiffs Victor Cherry and James Johnson, on behalf of themselves and others similarly situated, pray that this Court:

29

A.   Enter an Order (1) conditionally certifying the Waiver Collective; (2) approving notification, upon discovery of their identities from Defendant, to similarly situated Opt-In Putative Plaintiffs; and (3) appointing Representative Plaintiffs Cherry and Johnson and their counsel of record to represent said Waiver Collective;

B.   Award actual damages which Cherry and Johnson, individually, have sustained for Counts One and Two (ADEA), plus liquidated damages, where applicable, and interest thereon at the legal rate and additional recoverable damages, according to proof;

C.   Enter such further Orders:

(1)   Declaring Defendant's conduct to be in violation of Plaintiffs Cherry's and Johnson's (and, where applicable, Opt-In Putative Plaintiffs') rights under the ADEA and OWBPA;

(2)   Restoring Plaintiffs Cherry, Johnson to their rightful positions within WellPoint or, in lieu of reinstatement, ordering front pay and benefits for the period remaining until the planned retirements of Plaintiffs Cherry, Johnson, and other similarly situated employees;

(3)   Awarding Plaintiffs Cherry and Johnson, on Counts One and Two, equitable relief of back pay and benefits up to the date of reinstatement adjusted for the adverse tax consequences of a lump sum payment, together with pre-judgment interest compounded using the Internal Revenue Service adjusted prime rate and post-judgment interest, unpaid benefits, and benefits accrual; and

(4)    Enjoining WellPoint, Inc. from engaging in such conduct in the future, including the conditioning of receipt of severance upon release of rights to challenge age discrimination in violation of the ADEA and/or OWBPA without the provision of notifications required by the OWBPA.

E.    Award Plaintiffs their costs incurred herein, including reasonable attorneys' fees to the extent allowable by law; and

F.    Award such other and further legal and equitable relief as the Court may deem just and proper.

**PLAINTIFFS DEMAND TRIAL BY JURY.**

Respectfully submitted,

VICTOR CHERRY and JAMES JOHNSON, on behalf of themselves and all others similarly situated,

By: _____
                    Counsel

Harris D. Butler, III, (VSB No. 26483)
Rebecca H. Royals (VSB No. 71420)
BUTLER WILLIAMS & SKILLING, P.C.
100 Shockoe Slip, Fourth Floor
Richmond, Virginia 23219
Telephone: (804) 648-4848
Facsimile: (804) 648-6814
Email: hbutler@butlerwilliams.com
        rroyals@butlerwilliams.com